ENCYCLOPÆDIA BRITANNICA CO. v. WERNER CO. et al.

(Circuit Court, D. New Jersey. March 10, 1905.)

COPYRIGHTS—INTERIM COPYRIGHT ACT—CONSTRUCTION.

The interim copyright act (Act Cong. Jan. 7, 1904, 33 Stat. 4, c. 2), passed for the protection of exhibitors of foreign literature at the Louisiana Purchase Exposition, provides that copyright protection shall be extended to books, etc., published abroad, copies of which are intended for exhibition at the Louisiana Purchase Exposition; that one copy of any book copyrighted under the provisions of the act shall be delivered at the copyright office of the Library of Congress, with a statement duly subscribed in writing that the book is intended for such exhibition; and that the author, on complying with the act, shall have the sole liberty of printing, reprinting, publishing, and vending the same within the limits of the United States for the term of two years, and if during such time two copies of the original text of the book, or of a translation in the English language, printed from type set within the United States, or from plates made therefrom, are deposited in the copyright office, etc., such deposit shall extend the copyright for the full terms provided for by Rev. St. tit. 60, c. 3 [U. S. Comp. St. 1901, p. 3405]. *Held*, that such act did not apply to a foreign publisher of a book previously published in English, and sold by American publishers in the United States.

In Equity. On application for preliminary injunction.

Samuel J. Elder, Edmund A. Whitman, Carl H. C. Bumpus, and Frederic R. Kellogg, for complainant.

Rollin M. Morgan, Augustus T. Gurlitz, George W. Sieber, and James Buchanan, for defendants.

LANNING, District Judge. The complainant bases its right to a preliminary injunction in this case upon the provisions of the interim copyright act of January 7, 1904, 33 Stat. 4, c. 2. A copy of that act

(excepting section 4, which relates to the recording fees, and section 7, which relates to copyright protection of paintings, statuary, etc.) is set forth in the margin.[1] If there be substantial doubt as to whether the act can be construed so as to support the right claimed, that doubt is fatal to the application. Citizens' Coach Co. v. Camden Horse R. Co., 29 N. J. Eq. 299; Hagerty v. Lee, 45 N. J. Eq. 255, 17 Atl. 826;

[1] An act to afford protection to exhibitors of foreign literary, artistic, or musical works at the Louisiana Purchase Exposition.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the author of any book, map, chart, dramatic composition, musical composition, engraving, cut, print, chromo, lithograph, or photograph published abroad prior to November thirtieth, nineteen hundred and four, but not registered for copyright protection in the United States copyright office, or the heirs and assigns of such author, shall have in the case of any such book, map, chart, dramatic composition, musical composition, engraving, cut, print, chromo, lithograph, or photograph intended for exhibition at the Louisiana Purchase Exposition the sole liberty of printing, reprinting, publishing, copying, and vending the same within the limits of the United States for the term herein provided for upon complying with the provisions of this act.

Sec. 2. That one copy of such book, map, chart, dramatic composition, musical composition, engraving, cut, print, chromo, lithograph, or photograph to be exhibited as herein provided shall be delivered at the copyright office, Library of Congress, at Washington, District of Columbia, with a statement duly subscribed to in writing that the book or other article is intended for such exhibition and that the copyright protection herein provided for is desired by the copyright proprietor, whose full name and legal residence is to be stated in the application.

Sec. 3. That the register of copyrights shall record the title of each volume of any such book or other article herein provided for, or if the article lacks a title, shall record a brief description of it sufficient to identify it, in a special series of record books to be designated the "Interim Copyright Record Books," and shall furnish to the copyright claimant a copy of record under seal of such recorded title or description, and the said title or description is to be included in the catalogue of title entries provided for in section four of the act of March third, eighteen hundred and ninety-one.

Sec. 5. That the copyright protection herein provided for shall be for the term of two years from the date of the receipt of the book or other article in the copyright office.

Sec. 6. That if at any time during the term of the copyright protection herein provided for, two copies of the original text of any such book, or of a translation of it in the English language, printed from type set within the limits of the United States or from plates made therefrom, or two copies of any such photograph, chromo, or lithograph printed from negatives or drawings on stone made within the limits of the United States or from transfers made therefrom, are deposited in the copyright office, Library of Congress, at Washington, District of Columbia, such deposit shall be held to extend the term of copyright protection to such book, photograph, chromo, or lithograph for the full terms provided for in title sixty, chapter three, of the Revised Statutes of the United States, computed from the date of the receipt of the book, photograph, chromo, or lithograph and the registration of the title or description as herein provided for.

Sec. 8. That, except in so far as this act authorizes and provides for temporary copyright protection during the period and for the purposes herein provided for, it shall not be construed or held to in any manner affect or repeal any of the provisions of the Revised Statutes relating to copyrights and the acts amendatory thereof. That no registration under this act shall be made after the thirtieth day of November, nineteen hundred and four.

33 Stat. 4, 5, c. 2.

Home Insurance Co. v. Nobles (C. C.) 63 Fed. 642; Paine v. United States Playing Card Co. (C. C.) 90 Fed. 543.

The hearing has been had upon bill, answers, and affidavits. The material facts are these: About 1875 the firm of A. & C. Black, of Edinburgh, Scotland, being the owners and publishers of the Encyclopædia Britannica, began the publication at Edinburgh of a new edition of that work, consisting of 25 volumes, entitled "Encyclopædia Britannica, Ninth Edition." They completed its publication in 1889; having, it is claimed, acquired the literary property of the authors of all the articles contained in the work. Mr. Henry T. Thomas, in an affidavit filed by the complainant, says the work was imported into this country and sold here between 1878 and 1891, by agreements first between Samuel L. Hall and A. & C. Black, and afterwards between Charles Scribner's Sons and A. & C. Black. Messrs. Adam Black and William Walker Callender, members of the firm of A. & C. Black, in an affidavit also filed by the complainant, say that upwards of 50,000 sets were sold in the United States previous to 1897 by Little, Brown & Co., Charles Scribner's Sons, and Samuel L. Hall, and that these sets were all printed from the same plates as the volumes published and sold in the United Kingdom. And in their brief the counsel for the complainant say:

"The Scribners, as in fact all other American importers, purchased the Britannica, bound or in sheets, and sold it at their own risk and upon their own responsibility. We do not controvert the general distribution of the Britannica in the United States."

In another place in their brief they say:

"Boiled down, all this tautology [referring to the averments in the answer] amounts to the single allegation that the Britannica had been widely distributed throughout the United States prior to the passage of the interim act. That we do not deny."

In July, 1903, the right, title, and interest of A. & C. Black in the Encyclopædia Britannica was assigned to the Encyclopædia Britannica Company, the complainant in this case. On July 22, 1904, the complainant deposited in the copyright office, Library of Congress, one copy of each of the 25 volumes of its work, each of which copies, according to the certificates of the Librarian of Congress filed by the complainant, was declared to be "intended for exhibition at the Louisiana Purchase Exposition at St. Louis in 1904," and the copyright of each of which, it was further declared, the complainant "claims as proprietor for two years from this date (July 22, 1904), in conformity with the provisions of the act of Congress of January 7, 1904, entitled 'An act to afford protection to exhibitors of foreign literary, artistic or musical works at the Louisiana Purchase Exposition.'" The affidavit of P. K. Fitzhugh, also filed by the complainant, shows that the 25 volumes of the complainant's work had been on public exhibition at the Louisiana Purchase Exposition from August 25, 1904, until the date of the affidavit, which was September 21, 1904. It appears by the affidavit of Daniel M. MacLellan, filed by the defendants, that the defendants and their predecessors have been publishing an American edition of the encyclopædia for at least a dozen years, and that it is the further publication of this edition that the complainant now seeks to have enjoined.

Previous to 1891 the protection of our copyright laws was extended only to citizens and residents of the United States. Section 4971 of the Revised Statutes expressly provided that nothing in the copyright law should be "construed to prohibit the printing, publishing, importation, or sale of any book, map, chart, dramatic or musical composition, print, cut, engraving or photograph, written, composed or made by any person not a citizen of the United States nor resident therein." On March 3, 1891 (26 Stat. 1106, c. 565 [U. S. Comp. St. 1901, p. 3417]), the law was amended by extending to any foreign author or proprietor of any book, and the executors, administrators, or assigns of such author or proprietor, the privileges of our copyright law, provided that on or before the day of publication in this or any foreign country he should deliver at the office of the Librarian of Congress, or deposit in the mail within the United States addressed to the Librarian of Congress, a printed copy of the title of his book, and also two copies of the copyright book, printed from type set within the limits of the United States or from plates made therefrom. See sections 4952 and 4956 of the Revised Statutes, as amended by the act of March 3, 1891, c. 565, 26 Stat. 1106, 1107 [U. S. Comp. St. 1901, pp. 3406, 3407]. Obviously the amendment of 1891 did not extend the privileges of our copyright law to foreign authors, or proprietors of books that had been published or sold in this country previous to 1891. Unless the interim copyright act of 1904 so changed the law as to confer upon a foreign author, or his heirs or assigns, the privileges of our copyright law in a case where his book had been sold in this country previous to 1904, the complainant in this case has no standing. Did that act effect such an alteration of the law?

Counsel for the complainant insists that the language of the first section of the act is so broad that it confers upon the complainant, as the assignee of A. & C. Black, and through that firm of the authors of the articles contained in the Encyclopædia, the right to have the Encyclopædia copyrighted, notwithstanding it was sold in this country for many years previous to 1904, and even previous to 1891. They say in their brief that:

"The act is unlimited in scope as to the time within which such prior publication may have taken place, and is entirely silent upon the extent of such publication, and whether the book has been republished in this country or not. It does not refer to books which have or have not been copyrighted where they were first published, nor to the effect of the expiration of such copyright in a foreign country, if any such ever existed."

If this be the effect of the statute, the change made in our copyright law was indeed a most radical one. Previous to January 7, 1904, any publisher in the United States could republish in this country the Blacks' edition of the Encyclopædia Britannica, excepting the articles therein written by American authors and duly copyrighted, without violating any provision of our copyright law. Black v. Henry G. Allen Co. (C. C.) 42 Fed. 618, 9 L. R. A. 433; Black v. Ehrich (C. C.) 44 Fed. 793. If the rule for which the complainant's counsel contend be correct, the heirs or assigns of Herbert Spencer, who died a month before the interim act was passed, and whose works for a quarter of a century before 1891 were published and

widely distributed in this country, by complying with the provisions of the interim act at any time before November 30, 1904, might have obtained a copyright upon those works, and secured, in the language of the first section of the act, "the sole liberty of printing, reprinting, publishing, copying and vending the same within the limits of the United States" for the term of 2 years, together with the privilege of extending the term to 28 and possibly 42 years. The same thing would, of course, be true concerning Dickens' novels, Jarman on Wills, and a multitude of other works of foreign authors which have been republished in this country by American publishers. Nevertheless, if the Congress has clearly expressed its purpose of making this radical change, it is the duty of the court to give effect to that purpose.

The title of the act declares that it is intended to afford protection to exhibitors of foreign literary, artistic, or musical works "at the Louisiana Purchase Exposition." The first section provides that copyright protection shall be extended to books, maps, etc., published abroad, copies of which are "intended for exhibition at the Louisiana Purchase Exposition." The second section provides that one copy of any book copyrighted under the provisions of the act shall be delivered at the copyright office in the Library of Congress, "with a statement, duly subscribed to in writing, that the book * * * is intended for such exhibition." The evident purpose of the act was to induce foreign authors, and the heirs and assigns of foreign authors, to exhibit their books at the Louisiana Purchase Exposition, to the end that the knowledge of the contents of those books might be brought to the attention of American scholars and readers. Foreign authors whose books had never been published in this country would probably have hesitated to exhibit their books at the Exposition without some protection against having them republished in this country, with possible disadvantages to them. It appears in the proofs that, a year before the interim act was passed, an association of German publishers adopted a resolution declining to make any exhibition of books at St. Louis. The interim act offered to foreign authors, and their heirs and assigns, if they should exhibit their books at the Exposition, copyright protection for at least two years, and also provided that if, within the two years, two copies of the original text of any book so temporarily protected, or of a translation of it in the English language, printed from type set within the United States, or from plates made therefrom, should be deposited in the copyright office in the Library of Congress, copyright protection therefor should be continued for the full terms provided for in our general copyright law; being terms of 28 years and 14 years. Section 8 of the interim act (33 Stat. 5, c. 2) expressly declares that:

"Except in so far as this act authorizes and provides for temporary copyright protection during the period and for the purposes herein provided for, it shall not be construed or held to in any manner affect or repeal any of the provisions of the Revised Statutes relating to copyrights and the acts amendatory thereof."

As already stated, the purpose of the act was to secure the exhibition at St. Louis of foreign literary productions that had been pub--

lished abroad. By such exhibition the American public might acquire valuable information not otherwise available. And in consideration of such exhibition, and the advantages that might accrue therefrom to the American public, the exhibitors of such productions were offered the copyright protection of the act. No such consideration could exist in the case of a book by a foreign author which had been previously published in this country. Clearer language than that contained in the interim copyright act is needed to justify the conclusion that Congress intended to grant to any foreign author, or to the heirs or assigns of any such author, a copyright monopoly of a book of which American publishers might have large quantities on hand for the American market, and which, by the grant of the monopoly, such publishers would be prohibited from selling.

My conclusion is that the interim copyright act cannot receive the construction necessary to the complainant's success, and I might on that ground deny the application for a preliminary injunction. But each of the defendants has, in its answer, prayed the benefit of a demurrer to the bill. In my view, the bill is without equity, and should be dismissed. If a final decree be entered sustaining the demurrer and dismissing the bill, an appeal may be taken without delay. If, on the other hand, an interlocutory order be entered denying the preliminary injunction, no appeal can be had until final decree shall have been rendered on the pleadings and proofs. Edison Electric Light Co. v. Buckeye Electric Co. (C. C.) 64 Fed. 225. It seems to me that the administration of justice may be facilitated by entering a final decree sustaining the demurrer and dismissing the bill, especially in view of the fact that the complainant's copyright, if valid, will not continue beyond two years from its date, unless within that period the complainant incur the great expense of setting up within the United States the type of the 25 volumes composing the Encyclopædia Britannica, and deposit in the copyright office two copies of each of the volumes printed from such type.

I will therefore, on notice, settle the question as to whether there shall be entered a final decree dismissing the bill, or merely an interlocutory order denying the preliminary injunction.